The next case today is Maria Fornier v. Commonwealth of Massachusetts et al. Appeal number 20-2134. Attorney Flam, please introduce yourself for the record and proceed with your argument. Good morning, your honors. Benjamin Flam on behalf of the appellant Maria Fornier. May it please the court, initially Justice Thompson, may I reserve two minutes for rebuttal? Yes. Thank you, your honor. Unless the court prefers otherwise, I'd like to start where I suspect the court has the most questions, which is not on the adverse action, but rather on the cat's paw analysis here. Mr. Williams, who may the... If you don't mind, could you just specify what you think the adverse action is? Because I thought at least as the retaliation claim, it matters quite a bit, potentially, whether the adverse action is the statement by Spence or the adverse action is the subsequent decision by Bellow, which would implicate the cat's paw analysis. If it's the statement by Spence, we never get to the cat's paw, if I understand your argument. So, your honor, I'm happy to address it in that order, yes. We believe that the adverse Spence, not his statement, his words carry out the meaning. As we know from the chronology, there was a presentation on March 17th from Ripples. On March 27th, Mr. Spence decided to, quote, relaunch Fornier. It's going to keep her. Three days later, she engages in protected activity. Parties don't dispute that. And the very next day, she's called in for an unscheduled meeting where Spence says the following, quote, I'm taking you out. And then what happens next demonstrates that his statement was indeed the type of unequivocal employment action that constitutes an adverse employment action. What happened next? He sent out what he called a, quote, termination letter. That was followed by putting Fornier on leave, changing the locks to her office, and taking the nameplate off of her door. So, at that point, a reasonable jury could conclude, I would submit to this court, that nothing under the sun that Fornier could or would have done would have saved her job. Maybe I'm not making myself clear. Imagine for the moment that no protected activity had occurred before Spence did exactly what you just described. Okay? And, therefore, it wouldn't be a retaliation claim. It would be a discriminatory treatment claim. And the adverse action for the discriminatory treatment claim was claimed to be this decision by Spence. I take it in that setting, we have to then do a separate analysis of whether he might retreat from that decision and that would implicate Bellow, etc. My understanding is that in the retaliation context, an adverse employment action can be thought of as more capaciously than that, because what we're concerned about is chilling the protected activity. So, in that setting, even a threat to take it up to a superior in response to protected activity could itself be an adverse employment action, precisely because it would have the chilling effect. So, that's what I guess I was getting at when I wanted you to focus on the adverse action with respect to the retaliation claim. Because, at least in your briefing, it's not clear to me whether you are making an argument to us that Spence's action alone just was chilling, no matter what Bellow would have done with it, because any employee would be scared to have to go through the appeals process, even if they might retreat from it. And so, for retaliation purposes, that alone would be enough to be an adverse action. Your Honor, we argue essentially both. First, that Your Honor is correct, is that when one is, quote, taking you out of your position, the notion of whether there was the potential for and we believe did indeed have a chilling effect and would going forward. A second way to look at it, Judge, is that if you take Spence's act, his words, I'm taking you out, sending what he referred to as the, quote, termination letter, and then you look at what happened next, you see that there was no possibility for any retreat, at which point we can get to the cat's paw analysis. So, the point, Your Honor, is under these facts, the court could find initially that Spence and his actions was the entire retaliatory universe, and then a jury could get us to trial. In the alternative, if we look at how the actions played out, which is what Jonathan Williams did at the end, then we have to go through that cat's paw analysis. Let me ask you just one last way. Yes. Is a threat to fire, even if it is merely a threat, a serious threat, but just a threat, is that an adverse employment action in a retaliation claim? If the threat is perceived as unequivocal by the hearer, by the victim, then yes, Your Honor, and in this case, the threat was, remember, followed up with… I'll just ask it one last way. Yes. Here's what your mid-level supervisor says to the employee. I hear you just engaged in protected activity. I'm going to recommend to my boss that you get fired for that. Is that an adverse employment action? The answer is, Judge, it depends on the circumstances. On the circumstances I just gave you, is that an adverse employment action? No, Your Honor, because it's just a recommendation, and we would have to figure out… I had not thought our case law treated the retaliation context in that way, that recommendations to report you to your supervisor for engaging in protected activity don't trigger a retaliation claim, but if you're not making that argument, you're not. No, Judge, what I'm saying is, no, that can't be done. The point is, that puts an employee in fear of losing their job, and as Your Honor mentioned earlier, if it would put a reasonable person in fear and have that interorum, chilling effect, then it can indeed qualify as an adverse employment action. Moving on, Your Honor, because I know my time is limited, we take a look again at what happened next. If the court is not satisfied that the I'm taking you out decision constituted the adverse action, there's more. They changed the locks to her door after barring her from all courthouse buildings and removed her nameplate. What happened next? Three individuals apparently looked into this. Bellow, who conducted a hearing. Now, that hearing had no independent analysis whatsoever. At page A278 of the appendix, we know that there were mitigating factors. Those mitigating factors were never presented to Fournier, so she could mount a defense, and Bellow not only did he do no investigating on his own, he didn't even write his report. He lied about it and got caught at that position. The authors of his report were two lawyers who had been advising Spence, Beth Day and Eamon Gill. So, if we're taking a look at John Bellow's actions, it's clear that a jury could infer that Spence's animus flowed right through him, because he had no independent thoughts of his own. The same goes for Eamon Gill. Hadn't he seen the consultant's report? Yes. Yes, Judge. It's not as if all he knew is Spence said do this. He looked at the report, which had all this criticism of her, and he did not know, at least as the record shows, that she had engaged in protected activity. So, why wouldn't we just conclude he relied on the report, and the report itself doesn't show that there was any retaliation? Two critical points there, Your Honor. First of all, Bellow did indeed know that Fournier had made a retaliation complaint and she had engaged in protected activity. He even had the signing of his report until that retaliation complaint or report decision came through. And secondly, Judge, if we look to page A336 of the record, you can see that Elizabeth Day and John Bellow specifically asked Ripples, how many of Fournier's positive references did you interview? The answer was four out of 13, and we didn't do any follow-up. So, they had reason to know that there were problems with the report, and the fact that they didn't make any further inquiry into that or, and this is a critical point in this case, Your Honors. The question about whether Harry Spence knew everything in the Ripples report already or whether, as he claimed, it was shocking to him and news. The performance reviews that he wrote for Fournier praised her for approaching the challenges of the position with courage and documented that she was facing a lot of blowback for the necessary changes she was to the state of mind of the retaliator, which makes it insufficient as a matter of law to break the causal chain. Counselor, besides proximity, do you have, is there anything else in the record that would demonstrate animus on the part of Spence? Yes, Your Honor, there is, and it's in our brief. With respect to Spence's legacy, as we know at the time, Spence testified first that he spent a great deal of his administration focusing on racism and the fact that it was rampant throughout the trial courts. He testified that he might have done more work on that topic than any other court system in the country. Yet, at or around the time that Fournier's issues were unfolding here, we know that the United States Attorney's Office was investigating him. He had been accused of racism by Felix Arroyo, and he had been sued personally by these interpreters. So, on the wake of his retirement, with one foot out the door, a reasonable jury could infer that he could not and would not allow this to rear its ugly head again, this being more coverage of the racism under his watch. Your Honor, in our brief, you'll also see another critical point here is that in the Linda Madonis example, there was a woman who called another employee the N-word. What happened under Spence's watch? That individual, Spence referred to her comments as apparently offensive, and then she got a promotion and a pay raise. Fournier opposed racism in the trial courts, and she got out. So, outside of proximity and time, we have clear evidence as to Spence's state of mind at the time and the other circumstances, which a jury could use to conclude that Spence had to take her out because he needed to keep this under the rug and sail off into his retirement the way he wanted. Thank you, counsel. Go ahead. I'm still a little confused on what this cat's paw point is in your argument. You say there is evidence that Bellow knew before he made his decision that Fournier had engaged in protected activity? Yes, Your Honor. Okay, if that's the case, what is the import of the cat's paw point? Well, so the cat's paw point, Your Honor, is that the Commonwealth has argued that there were three individuals who did an analysis, and that Williams relied on them. So, even if Spence was retaliating, that the causal chain from Spence's... Is the point of that that there's evidence of the anti-retaliatory motive of Spence, but apart from timing, there's no evidence of the That's correct, Your Honor. There's no evidence that Bellow was supporting this because Spence, I'm sorry, because Fournier had engaged in oppositional activity. But what the evidence does show, Judge, again, is that Bellow didn't write his own decision. He lied about it. Just to pin you down, your answer to Judge Thompson suggests to me that there's evidence of the anti-retaliatory motive of Spence because of his commitment or self-perceived or desire to be perceived as somebody who was fighting racism, and so he would have had a motive to punish somebody who was saying that there was racism going on in his department. That's what I understood you to be saying. That's correct. The idea that there's no such evidence as to Bellow and nothing equivalent to that. That's correct, Judge, yes. So, you need the cat's paw analysis because you can see that Bellow straight up, even though there might be a proximity point, had no motive to act for anti-retaliatory reasons, even though Spence did. That is correct, Judge, yes. And to that, of course, Your Honor, just one more tiny point on that topic is that Bellow didn't write his report. We don't even know if he read it. The record is unclear. We know that the co-authors of his report were the attorneys who advised Spence while he was making his retaliatory decision. Thank you. You're welcome. Thank you, Mr. Phlam. Please mute your audio and video at this time. And, Mr. Hampton, if you could introduce yourself on the record. Good morning. May it please the court. My name is David Hampton, Assistant Attorney General, and I represent the appellees in this matter. I just want to make one thing factually clear before I reach into the substance of my argument. I believe Mr. Phlam said up top that on March 27th, Mr. Spence had decided to relaunch Maria Fornier. That's simply not true. There's no evidence to support that in the record. I understand why they've made that assertion, which is to show that there was one decision prior to the protected conduct, a change of heart, and then a different decision afterward, but it's simply not supported by the record. And the reply brief even tacitly acknowledges that there's no evidence in the record to support that assertion. When it pages 16 and 18 and 22 of the reply, it repeatedly says that this was the trial to relaunch her, or this was Spence's decision to relaunch her, and then does not cite anything to the record because there's nothing in the record. But wasn't this a conversation between Spence and Habib with a recommendation of either relaunch or terminate? There's no record in the evidence of such a conversation to know that they talked, but there's nothing in the evidence to say that Spence had at any time said, that is what I'm going to do. I'm going to relaunch her as per one of the options you have. The contemporaneous email on March 27 is between the independent consultant and the chief justice. And that email is at 467, but that's not with Harry Spence. And there really is nothing in his deposition, in his affidavit, in anything that says that that's what he had decided to do and then changed his mind. There's no evidence of it. To move to the substance of the main substance of the argument, the judgment of the trial court, of the district court, readily affirmed on the grounds of the decision below. That is, even assuming that the adverse employment action and adverse employment action took place on at that first meeting of Spence and Fournier, and even assuming that Spence has ever been informed of any protected conduct prior to that meeting, or indeed at any time prior to his retirement, and even assuming that the mere temporary between the protected conduct in that March 31st meeting was enough to satisfy the initial position of causation, the courtroom still failed for lack of a show pretext. The show pretext was to show that there were inconsistencies, implausibilities in the stated reasons of the trial court. In this case, the problem is that the reasons came before the protected conduct. Mr. Hampton, hang on a second. Jim? Jim? Hi, Judge. What can we do for you? I mean, I know that you're recording this, and we're only getting every other word from Mr. Hampton. Is there anything he can do? I can change out my microphone very quickly. Okay. Is this any better? Yes, just turn it up a little bit, please. Okay. No, I have the ability to turn it up, but... If you project. I will project. Yeah, that's much better. Thank you. Okay. I don't know how far to go back, but what I can say is that even engaging all of the assumptions that the district court did in the favor of Ms. Fournier, her case still fails for a lack of showing of pretext. She had to show that there were implausibilities or inconsistencies in the trial court stated reason. And as I just said, the reasons came before the protected conduct. What do you have to say about the way Mr. Flam just put it together for us? Well, as I just said, part of it is predicated on the idea that at some point, Harry Spence had decided to relaunch Maria Fournier, which simply isn't true. It's not in the record. But the reasons that the underperformance and uncivil conduct that were... Wait a minute. Assuming he had not decided to relaunch her, there's nothing that says he was prepared to terminate her regardless. That's correct. When you have the allegations, as just spelled out by Mr. Flam, of allegations of discrimination going on in Mr. Spence's department and his personal suit against him by the interpreters, his argument is that all of that which preceded this decision to terminate should be factored into a decision being made that followed on the heels of a complaint about another employee's discriminatory behavior with this historical context in the backdrop. I guess I would say that I don't believe any of that actually raises any inference that Harry Spence actually was engaged in retaliatory animus or was so consumed with his legacy that merely passing on the report of a discriminatory conduct... Four minutes remaining. ...because there's nothing in the record to suggest that that was an operating concern for him or for those later in the process. Here's one piece of the record that I want you to address that I don't think we've gotten into yet. If I understand the timing, there's been a lot of complaints about this person, and then he's also praised her in the past. He then gets this report, which all the parties understand this word relaunch to mean something other than terminate, correct? Yes, I believe so. Okay, so a favor. Rebranding, essentially. Yeah, keeper. Okay, so there's that report. If I understand the record, he then doesn't do anything with the report for almost a week, even though he's back in town. And then he calls her in on Friday all of a sudden to have this conversation where he tells she has to leave. Now, the only thing that's happened between the time he got that report, time he got back in town on Friday, if I understand it, is her filing this protected activity on Thursday. Is that right? Well, I mean, he's wrapping up his court administratorship. Whatever. Sure. In terms of the timing, the report comes in, he's back in town, doesn't act on it. The report has one option which would be favorable to her, another option that wouldn't be. And then Friday's the day he chooses to call her and says, I'm taking the negative option. It just happened the day before that she engaged in protected activity. That's a sequence that would seem to me a jury could at least think is kind of suspicious. And then if there were this other evidence, historically, it would then have some reason to think, oh, well, that's why he did it then. I'm not saying they're right, but why wouldn't that be a plausible thing for a jury to conclude such that we should give it to a jury? Well, I think that against the just the sheer severity and urgency of the reasons that had been percolating through the performance reviews, but obviously reached their peak in the Ripple's report, I don't think a reasonable juror could conclude that the reason is instead that. Here's the thing. It'd be one thing if the report said terminate, but the report said terminate or relaunch. So we had a choice to make. And yet, faced with that document giving that choice, he hadn't terminated all the other times she'd been criticized. He doesn't do anything for that whole week. And then on Friday, he decided to take the action. It just happens right before that. The day before is when the protected activity occurs. But I push back first against the idea that these were a menu of options that he was presented by the independent consultant. So there's nothing in the contract documents or otherwise that bound the trial court to do anything with respect to Ms. Fournier. Their job when they first came in was to study the Office of Court Interpreter Services. I'm just saying one actor who looked into it pretty deeply at the request of the agency thought a plausible response would be to relaunch or not to terminate her. And he has that input prior to his decision and acts on it only after having had it for a week, the day after she engages in protected activity. Well, why doesn't that raise an inference? If there's then some historical background that suggests, and he would have had some reason for being concerned about that protected activity. I think there has to be some evidence that that was actually an option he was favoring in order to show some kind of change of heart. There are two options. There is no reason to But there's no reason to assume it was going to be terminated. Well, the only evidence in the record is that they met on the 31st. They started to discuss a whole range of options of which one was terminate, but another was create a new role. Another was to transfer, which may not have materially affected the terms and conditions of her employment. And another yet was to step back into a demotion. So even as of March 31st, it's undisputed that those options were being raised as of March 31st. It's untrue that the answer was terminate. But either one of those options is still an adverse employment action. It wasn't letting her keep her same position, whether she was demoted, transferred. I mean, those are still adverse employment activities. Yes, I think that a juror would have to believe that it was plausible that the trial court would continue to keep her in the same position in light of all of the issues that both that department had experienced and also all of the information that Ripples had uncovered about her. Just one last thought. Wasn't it plausible to Ripples that they would? They had not been charged with any decision with respect to Ms. Fortier. But they were charged with recommendations, and one of the recommendations was not to fire her. They had been charged with making recommendations about a whole host of things, not specifically her employment. Including her, right? Well, whether they had been charged with that or not, it's hard to read their report and not think that a plausible option was to keep her because they suggested that as an option. They said that at the very... And if Ripples could think that, how could a juror not think that? Because they did not have the information, Ripples didn't have the information that came both before the Ripples report and then after. You have to remember that John Bellow is also... Once he takes over the reins, he serves as director of support services during her absence. He is getting the same comments from everyone saying that she cannot do this job, that her service has been catastrophic. If you look at... The adverse employment action was what Spence said that day. Do you disagree with this? I think... When do you think the adverse employment action occurred? I believe it occurred as of the time of termination. I don't think it's necessary to reach that. Our case law doesn't even support that. Well, then you would have to have two adverse employment actions. So you would have one that is the mere threat and proceeds on that analysis. And another that is the termination with all of the intervening breaks in the causal chain. Let's just go back to the threat one. You're not disputing that a threat can be an adverse employment action for retaliation purposes. I respectfully... I don't know. So you're not disputing it? I don't know whether this... That's not disputing it. You either are disputing it or you're not. It sounds like you're not disputing it. Okay, I'm not disputing it. Okay, so if we accept it... Wait, I'm sorry. I'm sorry. What am I disputing? That the threat... Is a threat a retaliatory action? A threat, I believe, could be a retaliatory action. I am not saying that I believe that this corresponds... Are you saying to us that Spence's action does not constitute the kind of threat that could be retaliation? Yes, that's what I'm saying. Okay. What's your best authority for that proposition? The cases that we cite about the possibility of retreat or reconsideration. Are those retaliation cases? No, they're not. So do you have any retaliation case that suggests a threat to terminate is not an adverse employment action in the retaliation context? Not at hand, Your Honor. Okay. Thank you, counsel. Counsel, if I might. So the report is in, and it suggests at least two alternatives, repositioning or termination. Attila Habib, in his sworn testimony, said that he proposed that either relaunching or termination are the recommendations he made. Based on the record as we have it now. Yes, it is. That was the state of affairs before her report of this discriminatory activity. That is correct. And after the report, two things happen. Spence tells her that she might not want to pursue this because of adverse circumstances, correct? Not to my knowledge. But we do know that after she makes the report, Spence decides to terminate it. Spence did not terminate her. He didn't even make that final decision. All he did is put her on administrative leave and schedule a disciplinary hearing. He did not terminate her. Well, he took her sign. He did not take her sign. There's no evidence to support that. Her sign disappeared and he changed the locks on the doors. There's also no evidence to support that he changed the locks on her doors. Of course, she was on leave with pay at this time, and her office had files in it that were confidential. So I don't want to speak too directly to the locks on the doors or changing the nameplate. But all of that could have been rescinded had John Bellow disagreed, had the diversity attorney found any evidence to support the claim that it was retaliation, had Ms. Forninger appealed to the advisory committee on personnel standards. I think, though, the thing that's just troubling is if you say to someone, I'm going to report you up and I'm going to take administrative action, don't you think that would have a chilling effect on reporting? Suppose he said, I understood you disengaged in protected activity. I'm going to report you for that. And you're going to be on administrative discipline for that. Wouldn't that be chilling? Yes, it would. So the thing to quibble with here isn't whether he took something that was adverse. It's why he did it. And I think what Judge Hawkins' question was getting at is, couldn't you infer that the reason he did it is because she engaged in protective activity, given the sequence of events, which is that it occurs the day after she engaged in that activity when he had two options, one of which would have been favorable to her and he didn't take it. Couldn't a reasonable jury have inferred what Judge Barron just said? No. Under Mesnick and under Ponte V. Steelcase, there will be times when clear, well-deserved discipline is coming down the pike, and then protected activity takes place, and it still does not reach a jury. That is what we're describing here. And that still doesn't reach a jury. It doesn't reach a jury under Breeden. It doesn't reach a jury under Ponte. And it doesn't reach a jury under Mesnick, among a variety of cases. The problem with what you're saying, though, is that that argument would be on very strong footing if Habib had not given two recommendations, relaunch or terminate. But because there was this other plausible option, I don't see that this case is precisely in the same line of cases as those you're citing. So this is how, I believe this is how implausible the inference they want is. They have Habib giving the presentation, recommending relaunch or termination. They have the protected conduct. And then, I believe it's footnote two of the reply, they have Attila Habib staying up late that night, at the night of the March 31st meeting, to invent, to manufacture, fabricate an email from a scheduler in order to forward to Harry Spence, apparently as the result of some conspiracy that they had formed that day. And then, to beef up what was already a record of misconduct and poor performance that was bursting at the seams. When you have this scale of misperformance and uncivil conduct, and you see the kind of raw materials that the Ripples group is engaging with at 188 to 190. And then you have, on the other hand, Ms. Fornier passing along the report of a discriminatory comment that she did not personally witness. It was reported at the same time by one of her subordinates, who was not in any way disciplined, but who is now one of the acting co-directors of support services. So, occupies part of the position she now applies. In its totality, no reasonable juror could say that, but for the protected conduct, she would still be employed to this day. You would have to believe that the trial court would actually have been happy for her to, the entire process, all three of these court administrators, that Spence, Bellow, and then finally Williams, would have been fine having Maria Fornier, after this Ripples report, continuing as the director of support services, despite having so many problems with parts of that department, that they paid a consultant to come in and study and try and figure out ways to address it. Do you disagree that Spence's department had a history of at least racial allegations, or that he was sued? There was a lawsuit against the trial court of which he was one of the defendants. I think what Mr. Flame is alluding to is some newspaper articles that he printed out and had shown to various witnesses. They're in Joint Appendix Volume 3. But no, I don't in any way agree with the idea that he was being singled out for racism or anything. There was a tête-à-tête between the trial court and Felix Arroyo Sr. around this time, but in no way did that personally implicate Harry Spencer, or in any way events some kind of racial attitude. I mean, there's just no direct evidence, as Judge Saylor found. Thank you, Counselor. Thank you. Any other questions? We're good? Okay, thank you. Thank you, Attorney Hampton. At this time, please mute your audio and your video. And Attorney Flame, please go ahead. And you have two minutes of rebuttal. Thank you, Your Honors. I'll get right to the point because I only have two minutes. First of all, I would direct Your Honors to page 728 of the appendix. Habib, on March 27th, gave Fournier the, quote, conclusion. It went from a recommendation on March 17th to now a conclusion. And it's a very reasonable inference for a jury to find that Spence sent him in to do that, because why else would he give him that? Why else would Habib have given Fournier that conclusion? We also know that... Pin down the conclusion for us again. But the conclusion is that, quote, a relaunch of both OCIS and Maria was necessary. Furthermore, Your Honor, if we look at page 328 of the appendix, we know that when Spence wrote his, quote, termination letter, he sent it to Habib for his thoughts and comments. So Habib was indeed involved in dealings with Fournier about Fournier. And although they posit him as some neutral third party, the evidence dictates otherwise. Is there anything in the record that explains what was meant by a relaunch or what that would entail? It is a little odd to me, given the evidence in the record of the difficulties that Fournier was having and of the concerns that many of the people she was supervising had about her, how that relaunch would work. So, Your Honor, in our brief is quoted Fournier's testimony where she describes the conversation with Habib. He said, it's pretty clear we need to rebrand you to the field. I will also note that... What would that mean? You rebrand you that she's now not going to bully people? I don't really understand that. Well, it's that I would argue, Your Honor, if you go to page 278 of the appendix, that's the mitigating factor slide from Ripple's. And it says that OCIS faces challenges in creating a positive reputation because, quote, small issues often foster lingering resentment. So the relaunch, Your Honor, would have been open communication. We also know from the performance reviews that Spence praised her for the things that he then later allegedly fired her for under Bulwer v. Mount Auburn and a whole line of cases in our briefs. That alone satisfies the pretexting. That's time. May I just make one more point, judges? Yes. Thank you. The recommendation on March 17th from Ripple's was to, quote, relaunch Fournier and OCIS. The first time that Habib ever recommended termination was in a, after the fact, three years later affidavit given to the trial courts as part of this litigation. There is absolutely no evidence whatsoever. The only evidence that was contemporaneous is his own PowerPoint slide, which he presented, and his own subsequent email on June 17th, 2017, where he says the conclusion was to relaunch Fournier. The only thing that happened between the delivery of that conclusion on March 27th and the decision to change and terminate Fournier was her oppositional activity. And as such, we urge this court to find that a jury could conclude the retaliatory animus here is indeed present and to reverse and remand for trial. Thank you very much, Your Honors. Judge Thompson, may I interject just to answer Judge Barron's question about the definition of relaunch? You don't need to. We can read in the record. You can do a 28-J if it's okay with Judge Thompson, from my perspective. Yes. Thank you. That concludes argument in this case. Attorney Flam and Attorney Hampton, you should disconnect from the hearing at this time. Thank you.